**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CSL GARAGE, LTD., individually and on behalf of all others similarly situated, <br><br>  Plaintiff, <br><br> v. <br><br> DISH WIRELESS L.L.C. and ECHOSTAR CORPORATION, <br><br>  Defendants. | Case No. 2:26-cv-616 <br> Judge Michael H. Watson <br> Magistrate Judge Kimberly A. Jolson <br><br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY DEMAND ENDORSED HEREON** |

Plaintiff CSL Garage, Ltd. ("CSL" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this First Amended Class Action Complaint against Defendant DISH Wireless L.L.C. ("DISH") and EchoStar Corporation ("EchoStar") (collectively, "Defendants") and alleges as follows on personal knowledge as to itself and on information and belief as to all other matters:

**INTRODUCTION**

1.      This case is about DISH's nationwide effort to walk away from a massive number of agreements that DISH used to build the country's first 5G Open RAN wireless network. DISH leased space from CSL's predecessor, and from hundreds, if not thousands, of similarly situated class members across the United States, on substantially identical terms, in order to install and operate the cellular equipment that powers its Boost Mobile network.  After DISH entered into long-term leases, licenses, or similar agreements with property owners throughout the United States, DISH's ultimate parent, EchoStar, elected to monetize its spectrum assets by selling them to AT&T and SpaceX in three transactions worth approximately $42 billion, and DISH decided it no longer needed (or wanted to pay for) the cell sites for which it previously

1

contracted to lease, license, or use on a long-term basis.  DISH simply walked away from its obligations to Plaintiff and other members of the class.

2.      Beginning in the second half of 2025 and continuing in to early 2026, DISH sent out a series of substantially identical letters sent to Plaintiff and other members of the proposed Class announcing that it would not perform its remaining obligations under its agreements ("the Repudiation Letters").  DISH did not pay any termination fees.  Instead, DISH invented an excuse: it claimed that "unforeseeable actions by the FCC" had triggered force majeure, frustration of purpose, and impossibility, and that DISH's obligations were therefore "excused."

3.      That excuse is meritless.  Nothing in the agreement with Plaintiff or other members of the Class allows DISH to avoid its payment obligations because it chose to conspire with EchoStar to sell off its spectrum for a massive profit.

4.      The supposed force majeure event described in these boilerplate letters is, in any event, fictitious.  The FCC did not order EchoStar to sell anything.  EchoStar publicly maintained that any FCC effort to revoke its spectrum licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless."  EchoStar then voluntarily elected to monetize that spectrum, at what its Chairman publicly called "market price" and not a "fire sale," through three negotiated transactions with AT&T and SpaceX worth approximately $42 billion. EchoStar's Chairman publicly described the result of those transactions as leaving the company "cash-rich."  A cash-rich parent's voluntary sale of its assets is not "force majeure," and DISH's assertion that it must therefore be excused from making its monthly payments to Plaintiff and other class members cannot be reconciled with the parties' contract, with common sense, or with the law.

5.      The Repudiation Letters were not DISH's idea.  As alleged in detail below, the nationwide repudiation campaign was planned, directed, and controlled by EchoStar — from the shared EchoStar/DISH headquarters in Englewood, Colorado, through an officer who serves simultaneously as a senior executive of both companies — as an integral component of the spectrum transactions EchoStar negotiated and signed for its own benefit.  EchoStar's Chairman and Chief Executive Officer, Charles W. Ergen, has publicly admitted as much, telling EchoStar's investors: "we informed all of our vendors that we had a force majeure event as we are allowed, as we have per our contracts," and "we do not believe we owe any money."

6.      On June 30, 2026, DISH and certain of its affiliates commenced voluntary chapter 11 cases in the United States Bankruptcy Court for the Southern District of Texas, jointly administered as In re DISH DBS Corporation, No. 26-90627.  This action is stayed as against DISH pursuant to 11 U.S.C. § 362(a).  Counts I, II, and III are restated herein solely to preserve them in the operative pleading; Plaintiff does not, by this amended pleading, seek any relief against DISH, demand any response from DISH, or seek to continue this action against DISH while the automatic stay remains in effect.  The claims and allegations added by this amended pleading are asserted solely against Defendant EchoStar, a non-debtor as to which the automatic stay does not apply.  On July 21, 2026, DISH commenced an adversary proceeding in its chapter 11 cases, DISH Wireless L.L.C. v. Those Parties Listed in Appendix A, Dkt. No. 472 in No. 26-90627 (Bankr. S.D. Tex.), seeking a declaration that the automatic stay reaches the claims against EchoStar in this and other actions, or an extension of the stay, or an injunction under 11 U.S.C. § 105(a).  No such relief has been granted, and no order of any court stays this action as against EchoStar.  Plaintiff files this amendment within its one-time period to amend as a matter

of course under Federal Rule of Civil Procedure 15(a)(1)(B), solely to preserve its rights; the amendment seeks no relief against, and requires no response from, DISH.

7.     Plaintiff, as assignee of the original Landlord under the Site Lease Agreement, and the other members of the putative Class, are entitled to all amounts due and to come due under their agreements, together with a declaration that no force majeure, frustration of purpose, or impossibility has occurred and that the agreements remain in full force and effect.

**PARTIES**

8.     Plaintiff CSL Garage, Ltd. is an Ohio limited liability company with its principal place of business in Columbus, Ohio.  CSL is the assignee of Capitol Plaza Garage, Ltd. ("Capitol Plaza") and the current Landlord under the Site Lease Agreement at issue in this action, pursuant to that certain Assignment and Assumption of Lease dated as of May 20, 2026 (the "Assignment").  CSL is the real party in interest within the meaning of Federal Rule of Civil Procedure 17(a).

9.     Defendant DISH Wireless L.L.C. is a Colorado limited liability company with its principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado 80112. DISH provides wireless voice and data services in the United States under its Boost Mobile brand.  DISH is an indirect, wholly owned subsidiary of EchoStar.

10.     Defendant EchoStar Corporation is a Nevada corporation that is headquartered in Englewood, Colorado.  EchoStar is the ultimate parent of DISH but was not a signatory of the Site Lease Agreement with Plaintiff or any other substantially similar agreements with the putative class members.

11.     EchoStar's headquarters are at 9601 South Meridian Boulevard, Englewood, Colorado 80112 — the same address that is the corporate headquarters and service address of

DISH.  EchoStar and DISH share a common headquarters campus, common senior management, and common control, and the enterprise also maintains a shared campus in Littleton, Colorado. DISH sits below EchoStar in a chain of wholly owned subsidiaries (EchoStar → DISH Network Corporation → DISH DBS Corporation → Neyland Networks L.L.C. → DISH).  EchoStar's Chairman and Chief Executive Officer, Charles W. Ergen, beneficially owns approximately 51% of EchoStar's equity and controls approximately 90.3% of its total voting power.

12.     DISH has no employees of its own and no independent operations.  Its workforce is supplied by EchoStar affiliate Echosphere L.L.C., the enterprise's "employer of record," and DISH depends on EchoStar and other affiliates for operational, administrative, technological, and other corporate services that are critical to its business under a shared services arrangement.  At all times relevant to the repudiation campaign alleged herein, DISH had no independent managers: the first "Independent Managers" of DISH's Board of Managers were not appointed until February 26, 2026 — after the campaign described below had concluded.

13.     John Swieringa — the executive who signed each of the Repudiation Letters — serves simultaneously as President, Technology and Chief Operating Officer of EchoStar and as President, Technology and Chief Operating Officer, and a member of the Board of Managers, of DISH, with responsibility for key technology and operations across the enterprise.

**JURISDICTION AND VENUE**

14.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (a) the proposed Class consists of at least 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one member of the proposed Class is a citizen of a state different from

5

Defendants.  The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over any related state-law claims.

15.    This Court has personal jurisdiction over Defendants because they have purposefully directed their conduct at, and engaged in continuous and systematic activity within, the state of Ohio, including by (a) entering into the Site Lease Agreement at issue to lease real property located in this District, (b) transmitting the Repudiation Letter to Plaintiff, and (c) engaging in significant and continuous business throughout this District.

16.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of the property that is the subject of the action, the leased Premises, is situated in this District.

**FACTUAL ALLEGATIONS**

A.    *DISH's Nationwide 5G Buildout and Its Standardized Site Lease Agreements*

17.    In or about 2019, DISH announced its plan to build "the nation's first 5G Open RAN network" and become the fourth nationwide wireless carrier in the United States, competing with Verizon, AT&T, and T-Mobile.  To deliver on that plan, DISH and its corporate parent committed to the Federal Communications Commission ("FCC") that DISH's 5G wireless network would reach at least 70% of the United States population by June 14, 2023.

18.    Building a nationwide wireless network requires two things: (a) FCC-licensed wireless spectrum, and (b) physical sites at which DISH could install the radio and related equipment that transmits over that spectrum.  DISH's then-parent, DISH Network Corporation (which, in 2023, merged with EchoStar), invested more than $30 billion to acquire spectrum licenses at FCC auctions.

19.     To house the equipment that operates that spectrum, DISH leased space on tens of thousands of cell towers, rooftops, parking garages, and other structures across the country. DISH did so by entering into substantially similar agreements with Plaintiff and other putative class members.  By May 2025, the enterprise had deployed more than 144,000 radios across more than 24,000 sites nationwide, and in 2025 DISH's rent under its tower and site leases totaled approximately $567.8 million.

**B.**     ***The Site Lease Agreement Between Capitol Plaza and DISH***

20.     Capitol Plaza Garage, Ltd., an Ohio limited liability company, and DISH entered into a Site Lease Agreement dated February 24, 2022 (the "Site Lease" or "Lease").  A copy of the Site Lease is attached as Exhibit A.  Under the Site Lease, Capitol Plaza leased to DISH approximately 150 square feet of space within the parking garage located at 30-50 South Young Street, Columbus, Ohio 43215 (the "Premises"), for DISH's use in installing, operating, and maintaining utilities, fiber, and other facilities necessary to operate DISH's wireless telecommunications equipment.

21.     The Site Lease has an Initial Term of 60 months, automatically renewing for up to four additional Renewal Terms of 60 months each, unless DISH gives the Landlord at least 180 days' prior written notice of non-renewal.  The Site Lease provides for monthly Rent of $1,800.00, escalating by 3% on each anniversary of the Commencement Date.

22.     Section 12.6 of the Site Lease (the "Force Majeure Clause") provides, in pertinent part:

> Notwithstanding anything to the contrary in this Agreement, neither Party shall be liable to the other Party for nonperformance or delay in performance of any of its obligations under this Agreement other than any obligation to pay Rent or other amounts due under this Agreement due to causes beyond its reasonable control, including, without limitation, strikes, lockouts, pandemics, labor troubles, acts

7

> of God, accidents, technical failure[,] governmental restrictions, insurrections, riots, enemy act, war, civil commotion, fire, explosion, flood, windstorm, earthquake, natural disaster or other casualty ("Force Majeure"). . . . If a Force Majeure event prevents the affected Party from performing its obligations under this Agreement, in whole or in part, for a period of forty-five (45) or more days, then the other Party may terminate this Agreement immediately upon Notice to the affected Party.

23. Two features of the Force Majeure Clause are critical to this action. First, even in the case of an actual force majeure event, the obligation to pay Rent is expressly carved out from the relief afforded by the clause: a force majeure event never excuses DISH from paying Rent. Second, the right to terminate the Lease based on a prolonged force majeure event belongs to the non-affected party, not to the party invoking force majeure. Under Section 12.6, the right to terminate based on force majeure thus belongs to the Landlord, not to DISH.

24. The Site Lease does not contain a contractual right for DISH to terminate the Lease for convenience, for cost or market reasons, for changes in DISH's business plan, or for changes in DISH's parent's spectrum holdings.

25. Under Section 12.1 of the Site Lease, Capitol Plaza Garage, Ltd. had the right to assign the agreement to any third party without the approval of DISH.

**C.**     ***The Assignment of the Site Lease to CSL Garage***

26. By Assignment dated as of May 20, 2026, Capitol Plaza assigned to CSL all of Capitol Plaza's right, title, and interest in and to the Site Lease. CSL accepted that assignment and assumed all of Capitol Plaza's obligations as Landlord under the Site Lease arising from and after the effective date of the Assignment. CSL is the present Landlord under the Site Lease and is entitled to enforce all rights of the Landlord thereunder.

**D.**     *EchoStar's Voluntary Sales of Spectrum to AT&T and SpaceX*

27.     By 2025, DISH had completed key components of its 5G buildout.  In its Force Majeure Letters, DISH represented to Plaintiff and other class members nationwide that "[s]ince 2020, working with you and our other partners, we successfully built the nation's first 5G Open RAN network, meeting our buildout milestones."

28.     On May 9, 2025, FCC Chairman Brendan Carr announced that he had "directed agency staff to begin a review of EchoStar's compliance with its federal obligations to provide 5G service throughout the United States per the terms of its federal spectrum licenses."  The FCC did not order EchoStar to divest any spectrum and did not revoke any of EchoStar's licenses.  EchoStar publicly maintained that any attempt by the FCC to revoke its spectrum licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless" and that EchoStar would "win" any "battle" with the FCC.

29.     Notwithstanding that EchoStar publicly maintained that any attempt by the FCC to revoke its spectrum licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless," EchoStar unilaterally elected to monetize its spectrum:

> (a)     on or about August 26, 2025, EchoStar entered into an agreement to sell certain 3.45 GHz and 600 MHz spectrum licenses to AT&T for approximately $23 billion;
>
> (b)     on or about September 8, 2025, EchoStar entered into a second agreement, with SpaceX, to sell certain AWS-4 and H-block spectrum licenses for approximately $17 billion; and
>
> (c)     on or about November 6, 2025, EchoStar entered into a third agreement to sell additional spectrum to SpaceX for approximately $2.6 billion.

30.     EchoStar's Chairman publicly described these transactions as voluntary, executed at "market price," and not the product of any "fire sale."  He further publicly described the result of the transactions as leaving EchoStar "cash-rich" and Boost Mobile "way more competitive" as a "growth business."

31.     None of these transactions was ordered or compelled by the FCC, by any other federal regulator, or by any court.  Each was a voluntary contract negotiated by EchoStar, which is not a party to the agreements at issue here.

**E.     *DISH's December 12, 2025 Repudiation***

32.     By letter dated December 12, 2025, signed by DISH's President, Technology & Chief Operating Officer John Swieringa (one of the many boilerplate "Repudiation Letters"), DISH notified Capitol Plaza, through counsel, that DISH would not honor its remaining obligations under the Site Lease.  DISH sent substantively identical Repudiation Letters to other putative class members nationwide.  A copy of the Repudiation Letter is attached hereto as Exhibit B.

33.     The Repudiation Letter stated, in pertinent part:

> The Agreement and the Premises (as defined in the Agreement) have been impacted by all of these unforeseeable actions by the FCC taken outside of DISH Wireless's control. As such, we are writing to inform you that the FCC's actions and the resulting spectrum sales have frustrated the principal purpose and completely destroyed the value of the Agreement and made it impossible for DISH Wireless to perform. As a result, DISH Wireless's obligations are excused. This letter will serve as notice under the Agreement of the events described herein, to the extent required, including without limitation with respect to any force majeure event ….

34.     The Repudiation Letter is substantively identical to the form letters DISH sent to other putative class member between late 2025 and early 2026 as part of DISH's coordinated, nationwide effort to walk away from its agreements.

**F.**     *The Repudiation Letter Has No Basis in the Site Lease*

35.     The Repudiation Letter rests on three asserted defenses: force majeure, frustration of purpose, and impossibility.  None applies, and none excuses DISH from its obligation to pay Rent or to otherwise perform under the Site Lease.

36.     <u>Force Majeure.</u>  The Force Majeure Clause does not permit DISH to terminate the Site Lease, does not excuse DISH from paying Rent, and does not in any event encompass the events described in the Repudiation Letter:

> (a)     Section 12.6 expressly carves out from the relief afforded by force majeure "any obligation to pay Rent or other amounts due under this Agreement."  Even if there had been a force majeure event, DISH would still owe Rent.

> (b)     Section 12.6 gives the right to terminate the Lease for a prolonged force majeure event to "the other Party," i.e., the non-affected party.  The Landlord, not DISH, holds that termination right.

> (c)     The events DISH cites—the FCC's inquiry into spectrum utilization and EchoStar's voluntary sales of spectrum to AT&T and SpaceX—were not "causes beyond [DISH's] reasonable control" and do not resemble the kinds of events enumerated in Section 12.6 ("strikes, lockouts, pandemics, labor troubles, acts of God, accidents, technical failure[,] governmental restrictions, insurrections, riots, enemy act, war, civil commotion, fire, explosion, flood, windstorm, earthquake, natural disaster or other casualty").  They were instead the product of voluntary business decisions made by DISH's corporate parent.

11

(d)  Force majeure is in any event unavailable to a party whose own conduct, or the conduct of its corporate affiliates, brought about the supposed event. EchoStar's voluntary $42 billion sales of its spectrum cannot be invoked by DISH as an event beyond DISH's reasonable control.

37.  Frustration of Purpose.  DISH's invocation of "frustration of purpose" fares no better:

(a)  The Force Majeure Clause displaces the common-law doctrine of frustration as to the events it addresses; as to those events, the parties' written agreement controls.

(b)  The principal purpose of the Site Lease—DISH's right to use the Premises to install, operate, and maintain wireless telecommunications equipment— has not been frustrated.

(c)  The supposed frustrating events—a potential FCC inquiry and EchoStar's choice to monetize its spectrum—were entirely foreseeable.  DISH Network Corporation's own public filings with the U.S. Securities and Exchange Commission, in 2019 and thereafter, expressly disclosed the risk that DISH's wireless spectrum licenses could be subject to revocation, non-renewal, or other adverse FCC action and that those licenses were subject to renewal or revocation "based on certain factors including, among others, public interest considerations, level and quality of services and/or operations provided by the licensee, [and] the extent to which service is provided to, and/or operation is provided in, rural areas and

12

tribal lands."  The risk was therefore allocated to DISH, not to Plaintiff and other class members.

(d)     Frustration of purpose is unavailable where the party seeking discharge, or its corporate affiliate, voluntarily brought about the change of circumstances.  EchoStar's voluntary $42 billion spectrum sales preclude any frustration defense.

38.     <u>Impossibility.</u>  DISH's invocation of "impossibility" is equally meritless.  DISH remains entirely capable of performing under the Site Lease.  DISH remains a going concern.  DISH's ultimate parent has touted publicly that the spectrum sales leave EchoStar "cash-rich."  Performance is not "impossible"; DISH has simply decided that it would rather not pay.

**G.     *DISH Ceases Payments***

39.     As of the date of the filing of this Complaint, DISH has failed to remit payments to Plaintiff under the Site Lease for the months of December 2025 through July 2026.  Several requests have been made to DISH for its failure to remit payment but have been ignored.

**H.     *EchoStar Directed, Controlled, and Executed the Nationwide Repudiation Campaign from Its Colorado Headquarters***

40.     The decision that DISH would cease performing under its agreements nationwide was not — and could not have been — made by DISH.  DISH had no employees, no independent managers, and no senior officers who were not simultaneously officers or personnel of the EchoStar enterprise.  The decision was made by EchoStar's senior management at the parties' shared headquarters in Englewood, Colorado, as an integral and planned component of the spectrum transactions EchoStar negotiated and signed.

41.     EchoStar had positioned itself to capture the enterprise's spectrum value — at DISH's expense — well before the 2025 transactions.  In connection with the December 2023

merger, EchoStar and DISH assured the FCC that "Mr. Ergen will continue to have ultimate control over the [spectrum] Licenses through his ongoing control of EchoStar."  Shortly after the merger closed, the enterprise began moving spectrum out of the DISH Network side of the corporate family and up to EchoStar: on January 10, 2024, DISH Network Corporation transferred equity in wholly owned subsidiaries holding licenses for AWS-4, H-Block, and other spectrum bands to EchoStar Wireless Holding L.L.C., a direct subsidiary of EchoStar, and on March 12, 2024, DISH Network Corporation sold a subsidiary holding its 700 MHz licenses to another EchoStar subsidiary.  The AWS-4 and H-Block licenses so transferred are among the very licenses EchoStar later sold to SpaceX.  Having consolidated the spectrum above its operating subsidiary, EchoStar was free to sell it for its own account — and did, retaining the proceeds while the subsidiary that had built its business on that spectrum was left with the lease obligations.

42.    EchoStar — not DISH — negotiated, approved, and executed the AT&T and SpaceX transactions.  The Repudiation Letters themselves concede the point.  As the form of the letter sent to class members states: "DISH Wireless is not a party to the AT&T or SpaceX agreements, does not own the spectrum licenses being sold to AT&T or SpaceX, and is not entitled to receive any of the spectrum sale proceeds at closing."  EchoStar structured those transactions so that Boost Mobile's subscribers would be served over AT&T's network under a "hybrid MNO" arrangement, a structure that, by design, rendered DISH's leased cell sites, including the Premises, useless to the enterprise.  The form letter admits the causal chain in a single sentence: "EchoStar entered into a series of transactions that will, over time, result in the decommissioning of our Boost Mobile radio access network."  DISH halted its 5G network

14

deployment in August 2025, immediately following the announcement of the spectrum sale to AT&T, before most Repudiation Letters were even sent.

43.     In August 2025, the same month EchoStar signed the AT&T agreement, EchoStar caused DISH to transfer its go-forward business to an affiliate beyond the reach of DISH's creditors: DISH contributed certain vendor contracts, liabilities, and core network assets to Boost SubscriberCo L.L.C. ("BoostCo"), an entity held under a different branch of the EchoStar corporate family, in exchange for $5.0 billion of forgiveness on an intercompany loan owed within the EchoStar enterprise.  The enterprise's wireless business was thereby split in two: the valuable, go-forward Hybrid MNO operations (moved to BoostCo, which continues to serve millions of customers), and the legacy obligations — including the agreements with Plaintiff and the Class and their rent obligations — left behind in DISH.  Within weeks of that separation, DISH began sending the Repudiation Letters.

44.     EchoStar's direction of the campaign was centralized and top-down.  Beginning in September 2025, form notices substantively identical to the Repudiation Letter received by Plaintiff's predecessor were sent to thousands of counterparties nationwide on a coordinated schedule that tracked the signing dates of EchoStar's spectrum transactions, each signed by John Swieringa — EchoStar's own President, Technology and Chief Operating Officer.  The Letters narrate EchoStar's regulatory affairs and EchoStar's transactions — matters within the knowledge and control of the parent, not of a leasing subsidiary — as the purported justification for the subsidiary's nonperformance.

45.     EchoStar has publicly admitted its direction and control of the repudiation campaign — repeatedly.  On EchoStar's November 6, 2025 earnings call for the third quarter of 2025 — five weeks before DISH sent Plaintiff's predecessor the December 12, 2025 Repudiation

15

Letter — EchoStar's Chairman and Chief Executive Officer, Charles W. Ergen, told the market that DISH's performance under its infrastructure contracts was excused and that EchoStar was willing to "work with" DISH's vendors to "try to resolve" the fallout.  On EchoStar's March 2, 2026 earnings call for the fourth quarter of 2025, Mr. Ergen went further, telling investors — speaking for EchoStar in the first person plural — that "we informed all of our vendors that we had a force majeure event as we are allowed, as we have per our contracts," and that "we do not believe we owe any money."  On the same call, Mr. Ergen described EchoStar as managing the disposition of DISH's contracts and litigation itself: "we have settled hundreds of contracts" with companies that had not litigated, and "we will engage with more tower companies to seek consensual solutions, and we will consider all our alternatives available to the company that is party to the tower group contracts to resolve these matters."  EchoStar likewise recorded on its own consolidated financial statements an approximately $16 billion charge for network decommissioning, and EchoStar's Chief Financial Officer told investors that the enterprise's wireless connectivity expenses would decline substantially in the first and second quarters of 2026 as cell-site decommissioning proceeded.  EchoStar planned the repudiation campaign, directed it, executed it through its own senior officer, accounted for it on its own books, settled or refused to settle the resulting claims as it alone saw fit, and claimed the campaign's financial benefits for itself.

46.     EchoStar's asserted justification for the campaign was known by EchoStar to be false when it directed the campaign.  EchoStar knew that the form Site Lease Agreement (a) expressly excludes "any obligation to pay Rent or other amounts due" from any relief afforded by force majeure, and (b) grants any termination right arising from a prolonged force majeure event to the Landlord, not to DISH.  EchoStar simultaneously maintained two irreconcilable

16

narratives: to Plaintiff and the Class, through the Repudiation Letters it directed, EchoStar attributed nonperformance to "unforeseeable actions by the FCC" said to be outside DISH's control; to its investors and the public, EchoStar's Chairman described the spectrum sales as voluntary, negotiated at "market price," not a "fire sale," and as leaving EchoStar "cash-rich." Both accounts cannot be true.  EchoStar directed the assertion, against thousands of small landlords and property owners, of contractual excuses it knew to be baseless, for the purpose of terminating the flow of Rent and other amounts to which Plaintiff and the Class are contractually entitled.

47. The completed scheme confirms its object.  Having caused DISH's go-forward business to be moved to BoostCo and retained the spectrum-sale value at the parent level, EchoStar caused DISH to commence a chapter 11 case on June 30, 2026, in which DISH has sworn that the more than $6 billion in damages asserted against it in more than 200 lawsuits by its landlords and other network counterparties "far exceed[]" DISH's "available assets and ability to pay" — an insolvency EchoStar itself engineered.  In that proceeding, EchoStar stands as the "stalking horse" purchaser of substantially all of DISH's remaining assets, expressly including causes of action held by DISH, free and clear of claims.  A parent that dismembers its subsidiary for the parent's own benefit, directs the subsidiary to repudiate its contracts along the way, and then repurchases the remains is not protecting any legitimate financial interest in the subsidiary, and acts without privilege or justification.

48. The FCC itself recognized where responsibility lies.  In its May 12, 2026 order approving the AT&T transaction, the FCC conditioned approval on EchoStar — not DISH — depositing $2.4 billion of the sale proceeds into a trust from which any claimant holding "a final judgment or arbitration award against or a settlement with EchoStar Corp., DISH Network Corp.,

DISH Wireless LLC, and/or any other EchoStar subsidiary or affiliate" for network-related amounts may recover, and required EchoStar to give notice of the fund "to all creditors of DISH Wireless LLC." The FCC found "such a condition is necessary to conclude that the proposed transaction serves the public interest."  The regulator that EchoStar blames for the entire episode thus required the parent to reserve for exactly the counterparty claims that EchoStar was simultaneously directing its subsidiary to disclaim in their entirety

49.     Plaintiff does not by these allegations assert any claim belonging to DISH or its bankruptcy estate.  The injury for which Plaintiff and the Class seek redress from EchoStar is their own, direct injury: the loss of Rent and other benefits of their own agreements, proximately caused by EchoStar's intentional procurement of DISH's repudiation and nonperformance of those agreements.

## I.      *EchoStar's Conduct Was Centered in, and Emanated from, Colorado*

50.     All of the conduct by which EchoStar procured DISH's repudiation and breach of the agreements occurred in, and emanated from, a single, clearly centralized location: the parties' shared corporate headquarters in Englewood, Colorado, and the enterprise's nearby Littleton, Colorado campus.  The spectrum transactions were negotiated, approved, and executed by EchoStar's senior management in Colorado; the decision to decommission the network and repudiate the agreements was made by EchoStar's senior management in Colorado; the form Repudiation Letters were prepared, approved, and disseminated at EchoStar's direction from Colorado; and the shared officer who signed them is based there.

51.     DISH has itself told a federal tribunal exactly this.  In its brief to the Judicial Panel on Multidistrict Litigation seeking to centralize the tower-lease actions in the District of Colorado, DISH represented that the District of Colorado "sits at the nexus of the alleged

conduct underlying the Towers Actions"; that "the majority of the alleged conduct underlying the allegations in the Towers Actions took place in Englewood or Littleton in the District of Colorado"; that "it is beyond dispute that the overwhelming majority of relevant witnesses, evidence and documents are located in Colorado"; that the counterparties' "contracts were negotiated by DISH Wireless employees based in Englewood or Littleton, Colorado"; that "many of EchoStar's communications with the FCC, as well as negotiations with its counterparties in the Required Sales Transactions, were conducted by EchoStar employees based in Englewood or Littleton, Colorado"; that "the vast majority of relevant documents are located in Englewood at DISH Wireless's and EchoStar's headquarters"; and that "a majority of the key witnesses are based out of DISH Wireless's and EchoStar's headquarters in Englewood, Colorado, or campus in Littleton, Colorado."  Brief in Support of DISH Wireless L.L.C.'s Motion for Transfer, In re: Towers Litigation, MDL No. 3182, Doc. 1-1 at 2, 13–15 (J.P.M.L. Mar. 2, 2026).

52.     The injuries caused by EchoStar's tortious interference are dispersed among Class members located in states throughout the United States; no single state of injury is common to the Class.  By contrast, the state of EchoStar's conduct, the state of EchoStar's and DISH's shared principal place of business, and the state from which the parties' relationships with the Class were administered are one and the same: Colorado.  With respect to Count IV, Colorado accordingly has the most significant relationship to the occurrence and the parties under Restatement (Second) of Conflict of Laws §§ 6 and 145, and Colorado law governs the tortious interference claims of Plaintiff and the Class.

19

**CLASS ACTION ALLEGATIONS**

53. Plaintiff brings this action on behalf of itself and all other similarly situated landlords pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3). The proposed Class is defined as:

> All persons or entities that, as of the date of the Repudiation Letter applicable to them, were parties to an agreement with DISH Wireless L.L.C. (or any of its predecessors or affiliates) that DISH purported to terminate, repudiate, or excuse, in whole or in part, through a letter invoking force majeure, frustration of purpose, and/or impossibility based on the FCC's spectrum-utilization inquiry and/or EchoStar Corporation's sales of spectrum licenses to AT&T or SpaceX (the "Class").

54. Excluded from the Class are: (i) DISH and its parents, subsidiaries, affiliates, officers, directors, employees, agents, and legal representatives; (ii) any judicial officer presiding over this action and members of his or her immediate family and judicial staff; (iii) counsel for the parties and their immediate families; and (iv) the legal representatives, heirs, successors, and assigns of any excluded persons. Plaintiff reserves the right to amend the Class definition and to propose state-specific subclasses after discovery and at the time of class certification.

55. Numerosity (Fed. R. Civ. P. 23(a)(1)). The Class is so numerous that joinder of all members is impracticable. On information and belief, DISH sent the Repudiation Letter, or substantively identical letters, to hundreds, if not thousands, of similarly situated putative class members across the United States. DISH has admitted in sworn bankruptcy filings that, beginning in September 2025, it sent such notices to thousands of counterparties. The identity of class members is readily ascertainable from DISH's books, records, and contracts.

56. Commonality (Fed. R. Civ. P. 23(a)(2)). There are numerous questions of law and fact common to the Class, the resolution of which will drive the resolution of this litigation, including:

(a) whether DISH entered into substantially uniform agreement with the members of the Class;

(b) whether the events described in the Repudiation Letter—the FCC's spectrum-utilization inquiry and EchoStar's voluntary spectrum sales to AT&T and SpaceX—constitute "force majeure" within the meaning of the agreements;

(c) whether those events constitute frustration of purpose or impossibility sufficient to excuse DISH's performance;

(d) whether DISH anticipatorily breached the agreements through the Repudiation Letter;

(e) whether DISH has breached the agreements by failing to pay Rent and other amounts due;

(f) whether the Class is entitled to a declaration that no force majeure, frustration of purpose, or impossibility has occurred and that the agreements remain in full force and effect;

(g) whether EchoStar's conduct constitutes tortious interference with the agreements between the Class and DISH;

(h) whether EchoStar directed, controlled, and executed the nationwide repudiation campaign;

(i) whether EchoStar's conduct emanated from a single, centralized location in Colorado such that Colorado law governs the tortious interference claims of the Class;

(j)  whether EchoStar acted with the requisite intent, and whether its conduct was improper and without privilege or justification;

(k)  whether EchoStar's conduct warrants punitive or exemplary damages; and

(l)  whether the Class is entitled to damages, including all unpaid and future Rent and other amounts through the end of the current Term under each agreement.

57.  Typicality (Fed. R. Civ. P. 23(a)(3)).  Plaintiff's claims are typical of the claims of the Class.  Plaintiff and the other class members are parties to substantially similar agreements, each received substantively identical Repudiation Letters from DISH, and each suffered the same kind of injury—loss of Rent and other amounts and the imposition of a wrongful purported termination—as a result of the same coordinated conduct by DISH and EchoStar.

58.  Adequacy (Fed. R. Civ. P. 23(a)(4)).  Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has no interests antagonistic to, or in conflict with, the interests of the other class members.  Plaintiff has retained counsel experienced and competent in class action litigation and complex commercial disputes.

59.  Predominance and Superiority (Fed. R. Civ. P. 23(b)(3)).  The questions of law and fact common to the Class predominate over any questions affecting only individual class members.  This case turns on common contractual language drafted by DISH, a common course of conduct by DISH and EchoStar (the nationwide Repudiation Letter campaign), and common legal questions—whether DISH's invocation of force majeure, frustration, and impossibility excuses its performance under the form agreements.  DISH itself has represented to the Judicial Panel on Multidistrict Litigation that "[a]ll of the Towers Actions rest on the same fundamental

22

factual questions," including whether the spectrum transactions were "'voluntary' business decisions" and whether they excused DISH's performance.  A class action is also superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment will avoid the inefficiency, expense, and risk of inconsistent rulings that would result from hundreds or thousands of individual actions and will permit putative class members (many of whom would otherwise lack the resources to litigate individually) to vindicate their rights.

60.　Declaratory Relief (Fed. R. Civ. P. 23(b)(2)).  DISH has acted, and continues to act and refuse to act, on grounds that apply generally to the Class, so that final declaratory relief is appropriate respecting the Class as a whole.

61.　Subclasses.  To the extent any choice-of-law issue arises, the Class may be certified with state-specific subclasses.  The breach-of-contract analysis is materially uniform across jurisdictions and presents no obstacle to certification.  As to Count IV, because EchoStar's conduct was uniform, centralized, and directed from a single state, the tortious interference claims of all Class members are governed by the law of a single jurisdiction — Colorado — and present no material choice-of-law variation.

## COUNT I
### Breach of Contract – Anticipatory Repudiation/Total Breach
### (On Behalf of Plaintiff and the Class against DISH)

62.　Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

63.　Plaintiff and each class member are parties to a valid and enforceable agreement with DISH.

64.　Plaintiff and each class member have performed all of their material obligations under their respective agreements, or such performance has been excused or waived.

23

65. Through the Repudiation Letter, DISH unequivocally and finally announced its intent not to perform its remaining obligations under the agreements, including its obligation to pay Rent. The Repudiation Letter is a definite and final communication that DISH considers itself excused from performance and that DISH does not intend to honor its obligations.

66. DISH's Repudiation Letter constitutes an anticipatory repudiation and total breach of the agreements. DISH's asserted defenses of force majeure, frustration of purpose, and impossibility are unavailable, do not excuse performance, and do not relieve DISH of its obligation to pay Rent or other amounts.

67. As a direct and proximate result of DISH's anticipatory repudiation and total breach, Plaintiff and the Class have suffered damages in an amount to be determined at trial, including without limitation all Rent and other amounts due and to become due under their respective agreements for the balance of the current Term (and, to the extent applicable, as renewed), together with pre- and post-judgment interest, and attorneys' fees and costs to the extent permitted by the agreements or applicable law.

### COUNT II
### Breach of Contract – Failure to Pay Rent
### (On Behalf of Plaintiff and the Class against DISH)

68. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

69. The agreements obligate DISH to pay Rent or other amounts monthly throughout the Term, on the dates and in the amounts specified therein. Section 12.6 expressly carves out the obligation to pay Rent from any relief afforded by force majeure.

70. Plaintiff and each class member have performed all of their material obligations under their respective agreements, or such performance has been excused or waived.

24

71.     DISH has failed and refused, and continues to fail and refuse, to pay Rent and other amounts due under the agreements.

72.     As a direct and proximate result of DISH's breach, Plaintiff and the Class have suffered damages in an amount to be determined at trial, including without limitation all unpaid Rent and other amounts due (and continuing to accrue) under their respective agreements, together with late charges, pre- and post-judgment interest, and attorneys' fees and costs to the extent permitted by the agreements or applicable law.

**COUNT III**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class against DISH)**
**(28 U.S.C. §§ 2201 and 2202)**

73.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

74.     An actual, substantial, and justiciable controversy exists between Plaintiff and the Class, on the one hand, and DISH, on the other, regarding the parties' rights and obligations under the agreements.  DISH has unequivocally asserted that its obligations are "excused" by force majeure, frustration of purpose, and impossibility and that the events described in the Repudiation Letter relieve DISH of its obligation to pay Rent and to perform under the agreements.  Plaintiff and the Class dispute that assertion.

75.     The controversy is immediate, real, ongoing, and ripe for judicial resolution.

76.     Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiff and the Class are entitled to a declaration confirming that:

(a)     no force majeure event has occurred;

(b)     the events described in the Repudiation Letter do not constitute "frustration of purpose" or "impossibility" excusing DISH's performance;

25

(c)     DISH is not excused from performing any of its obligations under the

agreements; and

(d)     the agreements remain in full force and effect, and DISH remains

obligated to perform all of its obligations thereunder, including its

obligation to pay Rent and other amounts.

77.     A declaration on the foregoing matters will resolve the present controversy and will provide essential guidance to the parties regarding their continuing rights and obligations.

**COUNT IV**
**Tortious Interference**
**(On Behalf of Plaintiff and the Class against EchoStar)**

78.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

79.     Plaintiff and each Class member are parties to a valid and enforceable agreement with DISH.  EchoStar is not a party to, and is a stranger to, those agreements.  DISH is, and at all relevant times has remained, a legal entity separate and distinct from EchoStar, formed and maintained as such by EchoStar's own choice; EchoStar has itself invoked and relied upon that corporate separateness, including in denying any responsibility for DISH's obligations.  Having structured, maintained, and benefited from DISH's separate corporate existence, EchoStar interfered with the agreements of a distinct contracting party and is subject to liability as the stranger to those contracts that it insists it is.  Indeed, DISH itself has pleaded, in its adversary complaint in the chapter 11 cases, that "EchoStar is not a party to any of the agreements with the 5G Network Providers and is not in contractual privity with any of the 5G Network Providers."

80.     Plaintiff and each Class member have performed all of their material obligations under their respective agreements, or such performance has been excused or waived.

26

81.     EchoStar was aware of the agreements between DISH and Plaintiff and other putative class members even though it was not a party to those agreements.  EchoStar structured, negotiated, and publicly described transactions expressly premised on the existence and planned decommissioning of DISH's leased cell-site portfolio — more than 24,000 sites generating approximately $567.8 million in annual rent — recorded the write-off of that portfolio on its own consolidated books, and administered the agreements through shared officers and a shared workforce at the parties' common Colorado headquarters.

82.     EchoStar intentionally procured DISH's repudiation and breach of the agreements, including DISH's ongoing failure and refusal to pay Rent and other amounts, by, among other things: (a) consolidating the enterprise's spectrum licenses under EchoStar following the 2023 merger; (b) structuring and executing the spectrum transactions so as to eliminate the enterprise's need for the leased sites; (c) causing DISH to transfer its go-forward business and core network assets to BoostCo in August 2025, leaving the agreements and their obligations behind; (d) deciding, at the parent level, that DISH would cease performing under the agreements; (e) directing the preparation and nationwide dissemination of the form Repudiation Letters through EchoStar's own President, Technology and Chief Operating Officer; (f) directing DISH to withhold all further Rent and other payments; and (g) controlling DISH's dealings with its counterparties after the fact, including which claims would be settled and on what terms, and DISH's litigation strategy.  EchoStar's Chairman has publicly confirmed EchoStar's authorship of this campaign: "we informed all of our vendors that we had a force majeure event . . . we do not believe we owe any money"; "we have settled hundreds of contracts."

83.     EchoStar acted with the purpose of terminating the Rent and other payment obligations owed to Plaintiff and the Class — an expense-elimination objective EchoStar itself

planned, directed, and claimed credit for — or, at minimum, with knowledge that DISH's breach of the agreements was certain or substantially certain to result from EchoStar's conduct. EchoStar's own form letter acknowledged that the transactions EchoStar "entered into" would "result in the decommissioning" of the network that the leased sites existed to host.

84.     EchoStar's interference was improper, and was undertaken without privilege or justification, solely to benefit itself even at the expense of DISH, in that, among other things:

(a)     EchoStar employed wrongful means, directing the assertion against Plaintiff and the Class of contractual excuses — force majeure, frustration of purpose, and impossibility — that EchoStar knew to be false and contractually foreclosed, including because Section 12.6 expressly excludes the Rent obligation from force majeure relief and because EchoStar simultaneously described the supposedly compelled spectrum sales to investors as voluntary, market-price transactions leaving it "cash-rich";

(b)     EchoStar acted in bad faith and with dishonesty toward Plaintiff and the Class, maintaining materially contradictory accounts of the same events to landlords and to investors;

(c)     EchoStar acted not to protect any legitimate financial interest in DISH, but to extract value from DISH for EchoStar's sole benefit and at the direct expense of DISH's contract counterparties: it caused the spectrum on which DISH's business depended to be consolidated under EchoStar and then sold for approximately $42 billion with no proceeds payable to DISH — notwithstanding that, by DISH's own sworn account, approximately

28

$13 billion of the cost of assembling that spectrum "was expended by [DISH] itself"; caused DISH's go-forward business to be moved to BoostCo; directed DISH to repudiate its agreements with Plaintiff and the Class; rendered DISH unable to pay the more than $6 billion in damages asserted against it; and now proposes to repurchase DISH's remaining assets, including its causes of action, free and clear of claims;

(d) EchoStar's conduct manufactured the very "inability to perform" on which the asserted defenses rest: EchoStar dismantled DISH's 5G operations, stripped DISH of its assets, and dictated DISH's nonperformance, and then directed DISH to point to the resulting incapacity as an excuse. A party cannot engineer the incapacity of another entity to cause that entity to be released from its third-party contractual obligations under a claim of impossibility; a parent that does so to its own subsidiary's contracts acts by wrongful means; and

(e) no privilege — including any financial-interest or parent-subsidiary privilege — attaches to interference accomplished by wrongful means, in bad faith, or in the service of concerted acts of self-dealing in which value was extracted from the subsidiary rather than protecting the value of the subsidiary.

85. Because of EchoStar's conduct, DISH breached its agreements with Plaintiff and the other putative class members by failing to pay Rent and other amounts due under the agreements.

29

86. As a result of EchoStar's intentional inducement of DISH's breach, Plaintiff and other putative class members have suffered damages, which will continue to accrue as DISH fails to pay the monthly Rent and other amounts due under the agreements. As the intentional procurer of those breaches, EchoStar is jointly and severally liable with DISH for all amounts due to Plaintiff and the Class under the agreements.

87. EchoStar's conduct was willful, wanton, malicious, in bad faith, and undertaken with conscious disregard for the contractual rights of Plaintiff and the Class and heedless of the consequences to them, entitling Plaintiff and the Class to punitive or exemplary damages to the maximum extent permitted by applicable law, including under Colo. Rev. Stat. § 13-21-102.

88. Count IV is governed by Colorado law for the reasons alleged above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that the Court enter judgment in favor of Plaintiff and the Class and against DISH and EchoStar, awarding the following relief:

A. Certifying this action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiff as Class Representative, and appointing undersigned counsel as Class Counsel;

B. On Count I, awarding Plaintiff and the Class compensatory damages, including all Rent and other amounts due and to come due under the agreements for the balance of the current Term (and, to the extent applicable, as renewed), together with pre- and post-judgment interest, and attorneys' fees and costs to the extent permitted by the agreements or applicable law;

C. On Count II, awarding Plaintiff and the Class compensatory damages, including all unpaid Rent and other amounts due (and continuing to accrue) under the agreements, together

with late charges, pre- and post-judgment interest, and attorneys' fees and costs to the extent permitted by the Site Lease Agreements or applicable law;

D.      On Count III, declaring that: (i) no force majeure event has occurred under the agreements; (ii) DISH has no right to terminate the agreements based on force majeure, frustration of purpose, or impossibility; (iii) DISH is not excused from performing its obligations under the agreements; and (iv) the agreements remain in full force and effect;

E.      On Count IV, awarding Plaintiff and the Class compensatory and punitive damages to the maximum extent under the law for EchoStar's outrageous conduct in interfering with the agreements of the Plaintiff and the Class, and holding EchoStar jointly and severally liable with DISH for all amounts due to Plaintiff and the Class under the agreements;

E.      Awarding Plaintiff and the Class their costs of suit and reasonable attorneys' fees to the extent permitted by the agreements or applicable law; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, on behalf of itself and the Class, hereby demands a trial by jury on all issues so triable.

Dated: July 23, 2026                    Respectfully submitted,

**/s/ Brian K. Murphy**
Brian K. Murphy, Trial Attorney (0070654)
Joseph F. Murray (0063373)
Geoffrey J. Moul (0070663)
Jonathan P. Misny (0090673)
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: (614) 488-0400
Facsimile: (614) 488-0401
E-mail:  murphy@mmmb.com
               murray@mmmb.com
               moul@mmmb.com
               misny@mmmb.com

William E. Nakasian (0047126)
Douglas M. Mansfield (0063443)
Lape Mansfield Nakasian & Gibson, LLC
9980 Brewster Lane, Suite 150
Powell, OH 43065
Telephone: (614) 763-2316
Facsimile: (614) 467-3704
E-mail: wenakasian@lmng-law.com
              dmansfield@lmng-law.com

*Counsel for Plaintiff and the Putative Class*